# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 23-1323V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| NANCY AJOLO, | \* |
| | \* |
| Petitioner, | \* |
| | \* |
| v. | \* |
| | \* |
| SECRETARY OF HEALTH AND | \* |
| HUMAN SERVICES, | \* |
| | \* |
| Respondent. | \* |
| | \* |

Filed: June 22, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Amy Senerth,* Muller Brazil, Dresher, PA, for Petitioner.

*Nina Ren,* U.S. Department of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

On August 16, 2023, Nancy Ajolo filed a petition for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34, as amended (the Vaccine Act). Petitioner alleged that she developed ulnar nerve and cubital tunnel symptoms in her left arm that were caused-in-fact by an influenza ("flu") vaccine that she received on October 5, 2021. The matter went to trial on October 27, 2025. For the reasons set forth below, I deny entitlement.

## I.    Factual History

Ms. Ajolo's pre-vaccination medical history included morbid obesity, a gastric bypass in 2014, iron deficiency anemia, hypertension, hyperlipidemia, stage two chronic kidney disease, and a complete left rotator cuff tear status post repair in 2017. Ex. 1 at 36–37. The month before the vaccination at issue, she was hospitalized for small bowel obstruction, pancreatitis, and after testing positive for a *C. difficile* gastrointestinal infection. Ex. 2 at 91–97; *see also* Ex. 4.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

On October 5, 2021, Petitioner (then 66 years old) had a post-hospitalization appointment with her primary care provider ("PCP"). At this time, she received the flu vaccine at issue—intramuscularly, in her left arm. Ex. 1 at 6, 170–75; Ex. 2 at 29. There is no evidence of any vaccine reaction—and although some records suggest that Petitioner communicated with her PCP within a week of vaccination, the record of that communication does not appear to include any complaints that could be vaccine-associated.[2]

Slightly over three weeks later (on October 28, 2021), Petitioner's PCP referred her to a hand surgeon for evaluation of a potential ulnar neuropathy. Ex. 1 at 208. A diagnosis of "ulnar neuropathy of *right* upper extremity" was also added to Petitioner's problem list on that date (although this reference to the right arm may be a typographical error). *Id*. at 196, 208 (emphasis added). On November 10, 2021, Petitioner saw orthopedist Sam Chen, M.D., complaining of left hand pain, tingling, numbness (worse over her ring and small finger), and weakness. Ex. 1 at 219, 224. She was unable to identify an inciting event for her symptoms, but noted that they began on October 5, 2021, after her vaccination. *Id*.

Petitioner's physical exam revealed abnormal results, including decreased sensation over the ulnar nerve distribution, mild tenderness along the medial epicondyle, and a positive cubital tunnel Tinel sign test result.[3] Ex. 1 at 225–26. Dr. Chen diagnosed Petitioner with left ulnar neuropathy and cubital tunnel syndrome, and discussed both conservative treatment and possible cubital tunnel release surgery, although he advised that surgery might not relieve her numbness and weakness. *Id*. Dr. Chen also referred Petitioner for an EMG/NCS.[4] *Id*. at 219, 226.

The EMG was performed on December 1, 2021, and it yielded normal results "except for what appeared to be rare fibrillations and [a] slight increase[ ] in activity in the left first dorsal interosseous." Ex. 1 at 247–48. The NCS showed reduced conduction velocities of the ulnar nerves and reduced sensory distal latency in the median and ulnar nerves of both the left and right arms. *Id*. at 248. The abnormal conduction velocities and distal sensory responses of the ulnar nerves were deemed to be "consistent with entrapment within Guyon's canal." *Id*. at 248–49. The distal sensory delay in the carpal tunnel was interpreted as consistent with mild bilateral carpal tunnel syndrome. *Id*.

---

[2] *See* Ex. 1 at 182–87 (October 11, 2021, records). It appears that tramadol and meloxicam were prescribed for Petitioner on that date, but no explanation for why is set forth in the record.

[3] A Tinel sign test "indicates a partial lesion or the beginning regeneration of a nerve." A "percussion is made over the site of a divided nerve," and a positive sign will result in "a tingling sensation in the distal end of a limb." *Tinel sign,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=106510 (last visited June 17, 2026).

[4] EMG studies assess the extracellular activity of muscles at rest when introduced to electric shocks. *Electromyography*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15854&searchterm=electromyography (last visited June 17, 2026).

2

Ms. Ajolo followed up with Dr. Chen on December 3, 2021. He added Guyon's canal entrapment, entrapment of the left ulnar nerve at the wrist, and mild/moderate left carpal tunnel syndrome as elements of her differential diagnosis. Ex. 1 at 254, 258. Petitioner determined she would go forward with surgical intervention to address these issues, and a procedure was scheduled for March 3, 2022. *Id.* at 258, 277.

In the winter of 2022, Petitioner continued to experience some left hand pain that impacted her sleep, and she was prescribed medication for the pain. Ex. 1 at 283. The ultrasound-guided carpal tunnel release and a left cubital tunnel decompression were performed as scheduled on March 3, 2022. *Id.* at 306, 308–09. The surgical note states that the "retinaculum was completely decompressed," and the ulnar nerve was "released proximally up to the inner muscular septum and distally the ulnar nerve was decompressed between the two heads of the flexor carpi nerves." *Id.* at 309. The ulnar nerve was examined up through the elbow, but no express compression at the elbow was noted, and there was no nerve tightness at the elbow, so nerve transposition was not performed. *Id.*

A week later, Ms. Ajolo attended a post-operative appointment with Dr. Chen (on March 10, 2022). Ex. 1 at 313. Although she was experiencing minimal pain, her numbness and tingling had not improved. *Id.* at 317. Dr. Chen referred Petitioner to occupational therapy ("OT"). *Id.* at 316, 319. Ongoing pain and sensory symptoms that month led Petitioner to seek prescription refills, and she expressed frustration that the procedure did not appear to have improved her condition. *Id.* at 332. On April 21, 2022, Ms. Ajolo underwent an initial OT evaluation. Ex. 2 at 29. She subsequently attended six sessions, through May 27, 2022, but did not find them to limit her pain. Ex. 1 at 27.

In May 2022, Petitioner went back to her PCP for an annual wellness visit. Ex. 1 at 340. She now reported daily pain in the "left cubital nerve territory," but indicated that nerve pain medication was providing partial relief. *Id.* at 345–46. She was prescribed an additional medication and referred to a neurologist. *Id.* at 345, 349.

Petitioner saw that neurologist (Dr. James Pearce) the next month. Ex. 1 at 381. Ms. Ajolo's neurologic exam was mostly normal, except for "some questionable weakness of [the] abductor digiti quinti on the left," and a "decrease in light touch in ulnar distribution of the left hand." *Id.* at 383. Dr. Pearce noted that Petitioner's prior EMG/NCS "curiously show[ed] no evidence of entrapment of the left ulnar nerve in the cubital tunnel but d[id] show some slowing across Guyon's canal." *Id.* He diagnosed petitioner with "[l]eft ulnar neuropathy with likely point of entrapment in Guyon's canal at the wrist rather than the elbow," and ordered a repeat EMG/NCS, that showed "somewhat improved" carpal tunnel and unchanged left ulnar nerve function. *Id.* at 383, 403–04.

3

In mid-July 2022, Petitioner contacted her PCP and asked that she be taken off one of the medications she had been prescribed. Ex. 4 at 411. She also complained about Dr. Pearce's references to carpal tunnel syndrome as the cause of her pain, noting that Dr. Chen had told her that her that her symptoms came from compression at the elbow. *Id*. There is no other relevant medical record evidence

## II.    Expert Testimony

### A.    Petitioner's Expert – Dr. John Hixson

Dr. Hixson is a neurologist, and he prepared two written reports in support of Petitioner's claim as well as testified at trial. Report, dated August 28, 2024, filed as Ex. 8-1 (ECF No. 16-2) ("First Hixson Rep."); Report, dated January 31, 2025, filed as Ex. 23-1 (ECF No. 18-2). Dr. Hixson opined that Petitioner had experienced a left-side ulnar neuropathy, and that it was likely vaccine-associated. Tr. at 9.

Dr. Hixson attended Texas A&M University for his undergraduate degree, and Johns Hopkins University School of Medicine for his medical degree. *See* Curriculum Vitae, filed Aug. 28, 2024, as Ex. 9 (ECF No. 16-3) at 1**.** He then completed his residency in Neurology at the University of Pennsylvania, followed by a fellowship in Epilepsy and Neurophysiology at the University of Iowa. *Id*. He is currently a Professor of Neurology at the San Francisco VA Medical Center and the University of California San Francisco, the Chief Medical Office at Nile Ai, and the Clinical Advisor for NextSense Inc. and Neura Health Inc. *Id.* at 2. Dr. Hixson is board certified by the American Academy of Psychiatry and Neurology. *Id*. Clinically, he sees patients in both an outpatient and inpatient setting—seeing patients with epilepsy and neurologic disorders. Tr. at 7. However, he does not have any expertise in neuromuscular medicine. *Id.* at 20.

An ulnar neuropathy, Dr. Hixson explained, involves the ulnar nerve, "one of the principal nerves that runs down through the arm coming out of the brachial plexus," and serves the "medial part of the hand as well as the intrinsic hand muscles." Tr. at 11, 54. This nerve provides sensory input as well as motor innervation for the hand. *Id.* Dr. Hixson proposed the experience of feeling "a sensation running down your arm" to the fingers was common if the nerve was struck, but the nature of the symptoms could worsen if the nerve became more injured. *Id.* The most common form of ulnar neuropathy would be limited to the cubital tunnel (a narrow passageway near the elbow). *Id.* at 10, 13.

Ulnar neuropathies, Dr. Hixson contended, can be caused by many things – most often compressive damage worsened by movement, but also sometimes by something "traumatic." Tr. at 12. For example, an arthritic condition or bursitis could lead to an "inflammatory flare" that might worsen an existing compressive issue. *Id.* Ultimately it is an area of "compressive risk," so

susceptible to harm due to anything that worsens compression. *Id.* In diagnosing an ulnar neuropathy, clinical features and their chronology are most important. Tr. 13. EMG testing results can corroborate an ulnar neuropathy, but because this kind of injury can exist despite normal EMG results, the test is not formally a diagnostic criterion. *Id.* at 13, 25.

Dr. Hixson maintained that a review of Petitioner's medical history demonstrated clinical symptoms (including sensory issues) consistent with cubital tunnel syndrome (which would be a form of ulnar neuropathy). Tr. at 10, 13. For example, Ms. Ajolo had described radiating pain that "emanated from the elbow," and she tested positive for Tinel's sign—a "secondary physical indicator," but consistent with an ulnar neuropathy. *Id.* at 10–11. Treaters had also deemed her presentation consistent with cubital tunnel neuropathy. *Id.* Clinical features in this case were sufficient for the diagnosis, Dr. Hixson contended, despite the absence of more visual proof of elbow or arm inflammation (which otherwise would only be viewable through some kind of radiologic imaging). *Id.* at 24, 25.

Vaccines could cause cubital tunnel syndrome, Dr. Hixson argued, and he identified three possible vaccine-associated mechanisms. First, "direct injury" due to the vaccine needle's misapplication, resulting in harm to the nerve, could occur in rare circumstances. Tr. at 14. Dr. Hixson differentiated this from a shoulder injury related to vaccine administration, or "SIRVA" (a commonly-asserted injury in the Program), noting that the location of inflammation related to a SIRVA would not be in the right place to result in the kind of compression needed for cubital tunnel syndrome. *Id.* at 26–27. Second, an autoimmune response to vaccination might cause the injury, in a manner equivalent to how brachial neuritis is suspected to occur (although once again Dr. Hixson conceded that the locus of inflammation mattered). *Id.* at 14–15. Dr. Hixson also noted that evidence he filed suggesting an autoimmune cause for this kind of injury involved situations where the immune system produced autoantibodies that cross-reacted against the nerves, but he could not and did not in this case propose an autoantibody attack on the ulnar nerve, or specific autoantibody responsible for that attack. *Id.* at 23.

The third possible mechanism for vaccine-caused ulnar neuropathy discussed by Dr. Hixson was the one he placed the most weight upon in his opinion—regional inflammation triggered by the vaccination that somehow traveled to the cubital tunnel region of the elbow, resulting in compression. Tr. at 15, 27–28, 56. This kind of response to inflammation in close proximity to the elbow would be particularly likely to cause the necessary compression. *Id.* at 53. But Dr. Hixson affirmatively contended that even inflammation beginning in the deltoid (where vaccines are typically administered, and where the record suggests Petitioner received the relevant flu vaccine) could result in migrating inflammation into the cubital tunnel region. *Id.* at 56, 57 ("there are other examples of acute inflammatory processes . . . a bursitis or arthritis . . . that can aggravate compressive neuropathy," and embracing "the concept of a regional inflammatory flare worsening or aggravating or unmasking focal neuropathies"). He also acknowledged on cross-

examination that this mechanism was a "more general inflammatory causation" theory that could potentially implicate any kind of immune insult that resulted in aberrant inflammation. *Id.* at 58.

In support of vaccine causation, Dr. Hixson referenced several case reports. *See* Tr. at 22–23; First Hixson Rep. at 6 (citing H. Kim et al., *Upper Limb Nerve Injuries Caused by Intramuscular Injection or Routine Venipuncture*, 12 Anesth. Pain Med. 103, 106 (2017), filed as Ex. 10 (ECF No. 16-4) (analyzing 645 patients with ulnar nerve injury for 30 years and discovering only 2 injuries that were caused by injection); V. Salanga & J. Hahn, *Traumatic Ulnar Neuropathy from Jet Injection: Case Report,* 19 J. Trauma 283 (Apr. 1979), filed as Ex. 12 (ECF No. 16-6) (reporting a case of a 30 year-old female with ulnar neuropathy after receiving a swine flu vaccine administered with the jet injection technique); L. Roncati et al., *Cubital Tunnel Syndrome Temporally after COVID-19 Vaccination*, 7 Trop. Med. Infect. Dis. 1, 2 (2022), filed as Ex. 20 (ECF No. 16-14) (case report of a 28 year-old male who paresthesia in his left arm 7 days after receiving a vaccine in the same arm); L. Roncati et al., *Carpal, Cubital or Tarsal Tunnel Syndrome After SARS-CoV-2 Infection: A Causal Link?*, 153 Med. Hypotheses 1 (2021), filed as Ex. 21 (ECF No. 16-15) (describing two different case reports of a 47 year-old and a 51 year-old, respectively, developing carpal and cubital syndrome after contracting COVID-19 virus. No vaccine was administered to either patient)).

These case reports, Dr. Hixson claimed, all showed ulnar neuropathy development due to cubital tunnel syndrome following vaccination—specifically the COVID-19 vaccination. *See* Tr. at 22–23; First Hixson Rep. at 6. The prevailing theory for what these observations revealed was that part of the immune-mediated inflammatory response associated with vaccines created autoantibodies. Tr. at 23; First Hixson Rep. at 6. On cross examination, however, Dr. Hixson acknowledged that some of these case reports did not involve a trauma-induced cause of cubital tunnel, or even cubital tunnel syndrome itself (although he maintained they did pertain to injury to a nerve proximal to the cubital tunnel region). Tr. at 22–23.

Here, Petitioner's receipt of the flu vaccine was likely causal of her cubital tunnel syndrome. Dr. Hixson observed that she had been experiencing no arm/elbow-related inflammation prior to vaccination, but started to undergo such symptoms within days to a week after. Tr. at 15, 16. No other causes for her symptoms could be identified on the record. *Id.* at 16. In effect, the vaccine produced inflammation that aggravated the ulnar nerve at an "area of known compressive risk" in the cubital tunnel. *Id.* at 19, 54. A mechanism like direct harm due to the vaccine needle was unlikely, however, since the record did not substantiate the vaccine having been mis-administered in or around the elbow. *Id.* at 21.

Dr. Hixson also opined that the timing of onset of Petitioner's symptoms was medically acceptable, when measured from the October 5, 2021 vaccination date. Onset of cubital tunnel due to vaccination would, he proposed, depend on the cause of the injury, with a direct trauma

6

mechanism likely to trigger symptoms within as short a time as an hour. Tr. at 17. Here, because the medium of harm was more likely due to localized but spreading inflammation, the time interval was likely somewhat longer, but could result in symptoms within a day's time. *Id.* at 18. This was consistent with Petitioner's recollected onset, since she had reported her symptoms started the day of or after vaccination. *Id.* at 19.

B.    Respondent's Expert – Dr. Nathaniel Robbins

Dr. Robbins is (like Dr. Hixson) a practicing neurologist with some academic duties, and he offered a single report for Respondent along with his trial testimony. Report, dated November 5, 2024, filed as Ex. A (ECF No. 17-1).

Dr. Robbins is an Assistant Neurologist at Massachusetts General Hospital and Brigham and Women's and Faulkner Hospital. Curriculum Vitae, dated Nov. 4, 2024, filed as Ex. B (ECF No. 17-5) ("Robbins CV"). Before holding this position, he was an Assistant Professor of Neurology at Dartmouth Geisel School of Medicine. *Id.* Dr. Robbins received his medical degree from Albert Einstein College of Medicine, and then went on to complete a residency in neurology at the University of California San Francisco and a fellowship in clinical neurophysiology at Dartmouth. *Id.* During his fellowship, he spent nine months learning about EMG, electrodiagnostic medicine, and neuromuscular medicine. Tr. at 30. Dr. Robbins is board-certified in clinical neurophysiology and electrodiagnostic medicine, psychiatry, and neurology. Robbins CV at 2. In his current role, Dr. Robbins teaches residents, medical students, fellows, and junior faculty on subjects such as peripheral nerve disorders, neuromuscular disorders, and central autonomic disorders. *See id.* at 1; Tr. at 30.  About 60% of Dr. Robbins's current practice involves treating clinical patients with a variety of illnesses, including peripheral neuropathies, including ulnar neuropathy. Tr. at 30. His practice requires him to frequently read EMGs. *Id.* Along with his practice and teaching positions, Dr. Robbins has published thirty to forty journal articles. Robbins CV at 3–5.

Dr. Robbins started his testimony by providing his own understanding of the alleged injury in this case. He defined neuropathy generally to occur where "something is wrong with the nerves," adding that one or more nerves can be implicated in a neuropathy. Tr. at 34. The ulnar nerve, he explained, constitutes a terminal branch of the brachial plexus "set" of nerves, beginning in the arm pit and providing finger sensations and controlling hand and forearm muscles. *Id.* at 34–35, 41. Cubital tunnel syndrome is the most common form of ulnar neuropathy (second only to carpal tunnel syndrome), and occurs due to compression damage to that nerve in the space it occupies near the elbow. *Id.* at 35, 41–42. A neuropathy affecting the ulnar nerve elsewhere in the arm would not be equivalent to cubital tunnel syndrome. *Id.* at 41, 51–52.

7

There were several possible causes for cubital tunnel syndrome, Dr. Robbins maintained. Direct compression due to arm position, for example, could produce symptoms (although Dr. Robbins felt it was uncommon for patients to be able to document the preceding thing they did that caused the arm positioning). Tr. at 35, 48. Arm overuse could also prompt "rubbing or stretching" of the ulnar nerve within the region of the elbow. *Id.* at 36. And raising one's arms/hands in a particular position (perhaps due to manual labor) could also spark the compression injury. *Id.*

Dr. Robbins did not contest the conclusion that Petitioner had likely experienced the cubital tunnel syndrome form of ulnar neuropathy. Tr. at 36. He noted that her overall clinical symptoms were consistent with the diagnosis, even despite confirmatory EMG test results. *Id.* at 42. But Dr. Robbins denied that Petitioner's receipt of a flu vaccine had likely caused her injury.

As a general matter, Dr. Robbins noted, it was unlikely the physical act of vaccine administration could ever lead to ulnar nerve harm unless one were to "inject the elbow directly." Tr. at 37, 43. This kind of direct injury due to subsequent inflammation would need to involve vaccine administration into the cubital tunnel. *Id.* at 43. Here, the record did not contain evidence of that degree of vaccine mis-administration. *Id.* at 44.

It was even more unlikely that inflammation localized elsewhere in the arm could indirectly lead to elbow-specific harm, and Dr. Robbins contested Petitioner's success in offering evidence supporting that proposed causal explanation. Tr. at 38. Even if localized swelling or inflammation in the arm (perhaps attributable to a vaccine) occurred, an ulnar neuropathy would not occur unless that inflammation went into the cubital tunnel as well. *Id.* at 40–41. Dr. Robbins also denied that such an immune-mediated process could occur in the span of a day. *Id.* at 37.

The medical record evidence in this case was also, in Dr. Robbins's opinion, unsupportive of the conclusion that Petitioner's injury was vaccine-caused. Tr. at 49–50. First, the record did not establish that the flu vaccine was administered into or near Petitioner's elbow. *Id.* at 37. Second, her symptoms had not begun fast enough temporally to be thought attributable to a vaccine mis-administration. *Id.* at 50–51. There was also little in the record suggesting that Petitioner's cubital tunnel syndrome could be associated with inflammation that had occurred elsewhere in her arm, with nothing suggesting she had manifested clinical symptoms like swelling or redness (and even the March 2022 surgery notes did not reflect any findings of inflammation in the cubital tunnel itself). *Id.* at 39; Ex. 1 at 309.

Dr. Robbins later acknowledged, however, that evidence of swelling or inflammation closer to the elbow would better support the causation theory proposed. Tr. at 45–46. He also admitted that edema within the cubital tunnel was capable of causing the compression needed for the injury (and symptoms close in time to a vaccination could stand as indirect proof of mis-

administration of the vaccine). *Id.* at 47, 49. And Dr. Robbins agreed that the record did not establish what other kind of physical trauma Petitioner might have experienced to explain compression on her ulnar nerve (although he maintained that it was uncommon to identify such an explanation) ("people don't go to the doctor because they are typing or something" before experiencing an ulnar neuropathy). *Id.* at 51.

## III.    Procedural History

This case was initiated in August 2023. After its activation from "pre-assignment review," Respondent's Rule 4(c) Report opposing entitlement was filed in April 2024 (ECF No. 14). The parties thereafter obtained and filed the expert reports addressed above, completing the process in January 2025. I thereafter set a schedule for the matter to be heard at trial on October 27, 2025, and the trial occurred as planned. The claim is ripe for resolution.

## IV.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that she suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that her illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[5] Petitioner alleges a causation-in-fact claim (and there is otherwise no Table claim for cubital tunnel syndrome or ulnar neuropathy more broadly).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not

---

[5] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (May 6, 2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (the contention that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard"

deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the

phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.      *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to

12

conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony— especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the

13

result of a rational determination. *Burns*, 3 F.3d at 417.

C.      *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743

14

(quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.      *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case— just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

**ANALYSIS**

The parties agree on the diagnosis of cubital tunnel syndrome as explaining Petitioner's symptoms. Br. at 1; Opp. at 10. They therefore only dispute the *cause* of that injury.

Although claimants have in the past sought compensation for alleged vaccine-caused ulnar neuropathies, there are very few reasoned decisions addressing causation in the context. At least one petitioner successfully established entitlement under *Althen* for this kind of injury. *See Salazar v. Sec'y of Health & Hum. Servs.*, No. 15-817V, 2021 WL 319393 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (finding that petitioner established by preponderant evidence that she sustained a right ulnar neuropathy caused by her October 2, 2014, receipt of the flu vaccine). That individual had received a right-sided vaccination, experiencing an immediate reaction and pain, evidence of which was concretely memorialized in the relevant medical records. *Salazar*, 2021 WL 319393, at *5. Relying on a theory comparable to what is offered herein, the *Salazar* petitioner maintained that a pre-existing asymptomatic condition (cubital tunnel syndrome) had been "unmasked" by the vaccine's

misadministration, resulting in nerve injury. *Id.* at *9–11. Importantly, the petitioner submitted direct proof that she was asked to bend her arm 90 degrees at the elbow, place her hand on her hip, and flex forward, *at the time of* vaccine administration. *Id.* at *5. *Id.* The special master deemed all three *Althen* prongs met. *Id.* at *18–22.

In other cases, however, an ulnar neuropathy has not been deemed vaccine-caused. *See, e.g.*, *Cevasco v. Sec'y of Health & Hum. Servs.*, No. 23-0530V, 2025 WL 1696786, at *1 (Fed. Cl. Spec. Mstr. May 27, 2025) (flu vaccine not demonstrated to have been causal of ulnar neuropathy); *B.T. v. Sec'y of Health & Hum. Servs.*, No. 21-1213V, 2024 WL 4973025, at *5(Fed. Cl. Spec. Mstr. Nov. 8, 2024) (flu vaccine was not causal of ulnar neuropathy beginning within two or so days of vaccination). These determinations did not reject outright the possible causal association between vaccination and this kind of injury, but did take into account whether the relevant facts actually supported a prong two, "did cause" showing.

One thing that all relevant cases suggest is that it matters whether record evidence establishes that the vaccine at issue was likely administered in the wrong part of a claimant's arm. The *Salazar* petitioner, for example, was easily able to substantiate independent medical record evidence that the vaccine had been mis-administered. *Salazar*, 2021 WL 319393, at *18. Here, by contrast, there is no such evidence. *Salazar* also involved documented *immediate* pain—again, unlike this case. *B.T.* and *Cevasco* involved pain longer after. *B.T.,* 2024 WL 4973025 at *2; *Cevasco*, 2025 WL 1696786 at *1–2, 5.

Taking the above into account, I do not find entitlement established under *Althen.*[6] First, Petitioner cannot demonstrate that the flu vaccine "did cause" her ulnar neuropathy—*i.e.*, that it was likely a substantial factor in her injury. There is little evidence *in this case* that the vaccine at issue was *not* administered in the right location, distinguishing these facts from *Salazar.* Moreover, Petitioner can reference no treater support for causation—not a *sine qua non* for this *Althen* prong, but the kind of evidence often cited by claimants as corroborative of causation. *See, e.g.*, *Scott v. Sec'y of Health & Hum. Servs.*, No. 21-2159V, 2026 WL 267732, at *12 (Fed. Cl. Spec. Mstr. Jan. 7, 2026); *Andreu*, 569 F.3d at 1375–76; *Capizzano*, 440 F.3d at 1325–26. And as Dr. Robbins noted, there is no evidence in this case that Petitioner experienced an inflammatory response to the October 5, 2021 vaccination that could have caused the secondary compression of the ulnar nerve resulting in cubital tunnel syndrome. Thus, even if a vaccine *properly* administered could produce inflammation that migrated into the cubital tunnel, as suggested possible by Dr. Hixson, the record is not consistent with that having occurred (unless inflammation is assumed from the fact of injury alone).

---

[6] A claimant must satisfy all *three* prongs to obtain entitlement. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 F. App'x. 976, 980 (Fed. Cir. 2014). I therefore need not analyze Petitioner's success in establishing all three elements, and confine my discussion to only two of the prongs.

16

Second, it has not been preponderantly shown in this case that the theory focused upon by Dr. Hixson[7]—that inflammation due to the vaccination somehow moved into Petitioner's cubital tunnel, leading to an elbow-specific ulnar neuropathy—was preponderantly established. The experts seemed to agree that it is *compression* of the ulnar nerve in a particular location that results in cubital tunnel syndrome—and the fact that direct trauma can lead to that underscores the importance of a localized insult. Dr. Hixson's theory relies on the general assumption that inflammation "nearby" could also travel into the locus of the cubital tunnel, but that proposition lacks sufficient medical or scientific support to be reliable. In the end, it is far more likely that the degree of inflammation necessary to result in this kind of nerve injury would need to be directly introduced somehow into the cubital tunnel—not that the general inflammation sparked by routine vaccine administration (which itself is not necessarily sufficient to cause harm) would "seep" from the deltoid to the elbow.

## CONCLUSION

Because Petitioner did not carry her preponderant burden of showing causation, I am compelled to deny compensation.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[8]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[7] There is better support for the idea that a mis-administered vaccine (injected below the deltoid and/or close to the elbow) could lead to cubital tunnel syndrome, as found to have occurred in *Salazar.* But Dr. Hixson acknowledged the evidence in this case does not support that having occurred. Tr. at 21–22. Thus, that causation theory cannot be effectively applied to this case.

[8] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.